# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **BOBBY J. MEADE, JR.,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:09cv00048 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Bobby J. Meade, Jr., filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2009). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4ᵗʰ Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Meade protectively filed his applications for DIB and SSI on November 28, 2005, alleging disability as of November 2, 2005, due to uncontrolled diabetes, high blood pressure and kidney problems. (Record, ("R."), at 171-74, 234, 502-05.) The claims were denied initially and on reconsideration. (R. at 158-60, 164, 167-69.) Meade then requested a hearing before an administrative law judge, ("ALJ"), which was held on October 4, 2006, and at which he was represented by counsel. (R. at 41-101, 170, 508-10.)

By decision dated April 27, 2007, the ALJ denied Meade's claims. (R. at 16-27.) The ALJ found that Meade met the nondisability insured status requirements of the Act for DIB purposes at least through September 30, 2009. (R. at 25.) The ALJ also found that Meade had not engaged in substantial gainful activity since November 2, 2005, the alleged onset date. (R. at 26.) The ALJ determined that the medical evidence established that Meade suffered from severe impairments, namely type II diabetes mellitus, diabetic neuropathy, hypertension, kidney dysfunction and obesity, but he found that Meade did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 26.) The ALJ found that Meade's allegations regarding his limitations were not totally credible. (R. at 26.) He further found that Meade had the residual

functional capacity to perform light work[1] limited by an occasional ability to climb steps and ramps, to balance, to stoop, to kneel, to crouch and to crawl, as well as an inability to climb ladders, ropes or scaffolds or to withstand concentrated exposure to extreme cold, vibration or hazards. (R. at 26.) The ALJ found that Meade could perform his past relevant work as an inspector. (R. at 26.) Based on Meade's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ also found that other jobs existed in significant numbers in the national economy that Meade could perform, including jobs as a cashier, a domestic cleaner and a general office clerk. (R. at 26.) Thus, the ALJ found that Meade was not under a disability as defined under the Act and was not eligible for benefits. (R. at 26-27.) *See* 20 C.F.R. §§ 404.1520(f),(g), 416.920(f),(g) (2009).

After the ALJ issued his decision, Meade pursued his administrative appeals, (R. at 11), but the Appeals Council denied his request for review. (R. at 7-10.) Meade then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2009). The case is before this court on Meade's motion for summary judgment filed December 18, 2009, and the Commissioner's motion for summary judgment filed February 16, 2010.

## II. Facts

Meade was born in 1963, (R. at 52, 172), which classifies him as a "younger

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2009).

person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a high school education and special training in automotive repair. (R. at 241.) He has past relevant work experience as a cleaner, a forklift driver and a "reworker" for a cola production company, a gate guard, a general laborer, a lumber stacker, a parts delivery person, a parts trimmer for a molding company, a warehouse packer, a welder and a tow motor driver. (R. at 235-36.) Meade testified that he stopped working at the cola production company in December 2005 after his employer cut his hours drastically based on fears that he would suffer a work injury due to medication side effects, including dizziness and drowsiness, and the frequency with which he had to check his blood sugar level. (R. at 50-51, 69.) Nonetheless, Meade testified that in January 2006, Dr. Bentley, his family doctor, released him to go back to work. (R. at 56.) He testified that when he informed Dr. Bentley that his former employer did not want him to return to work, Dr. Bentley opined that Meade was unable to work due to his medications. (R. at 57.) Meade testified that although he had tried to be compliant over the previous couple of years with his diabetes treatment, it was difficult to afford his medications. (R. at 58-59.) He testified that in addition to receiving some of his medications through a pharmacy, he also received some through a community-based program. (R. at 55, 59.) With the help of this program, Meade noted a period of only about a month that he had to go without medication. (R. at 59.)

Meade testified that he had numbness in both legs from the knees down, stating that he could hardly feel his feet. (R. at 64-65.) He stated that he not been prescribed any assistive devices, and he admitted that he walked up three flights of stairs to the hearing room, but had to stop three times. (R. at 65.) Meade testified that he tried to exercise as much as he could, including walking around his "dad's place" and walking

around a track.  (R. at 66.)  He stated that he walked a mile three to four times a week, but not all at one time.  (R. at 66-67.)

Meade testified that he lived with his retired, disabled father and that he prepared his own meals, helped with household chores, read the newspaper, watched television and sometimes walked for exercise.  (R. at 82-84.)  He further testified that he went out to eat approximately once monthly and attended high school football games on some nights.  (R. at 84.)  Meade testified that he did not drive unless required.  (R. at 85.)

James Williams, a vocational expert, also was present and testified at Meade's hearing.  (R. at 86-100.)  Williams testified that the rework job testified to by Meade was classified as a bottle inspector in the Dictionary of Occupational Titles, ("DOT"). (R. at 90.)  He classified this job as light and semiskilled.  (R. at 90.)  Williams classified the cleanup crew job as heavy[2] and unskilled, the delivery driver as medium[3] and semiskilled, the forklift driver as medium and semiskilled, the warehouse packer as medium and unskilled, the gate guard as light and semiskilled and the lumber yard stacker, as performed, as medium and unskilled.  (R. at 91-92.)  Williams was asked to consider a hypothetical individual of Meade's age, education and past work experience, who could perform light work diminished by an occasional ability to

_____

[2]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds.  If someone can perform heavy work, he also can perform medium, light and sedentary work.  *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2009).

[3]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds.  If someone can do medium work, he also can do light and sedentary work.  *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2009).

climb ramps/stairs, to balance, to stoop, to kneel, to crouch and to crawl, but who should never climb ladders, ropes or scaffolds and who should avoid concentrated exposure to extreme cold, vibrations and hazards such as dangerous machinery or unprotected heights. (R. at 92.) Williams testified that such an individual could perform Meade's past work as an inspector. (R. at 94.) Williams also testified that such an individual could perform other jobs existing in significant numbers in the national economy, including those of a cashier, a domestic cleaner and a general office clerk. (R. at 95.) Williams was next asked to consider the same hypothetical individual, but who could stand and/or walk for a total of only about two hours in an eight-hour workday and whose ability to push and pull with the lower extremities was limited. (R. at 96.) Williams testified that such an individual could not perform any of Meade's past relevant work, but could perform the sedentary[4] jobs of a food and beverage order clerk, a survey worker and a security surveillance monitor, all existing in significant numbers in the national economy. (R. at 97.)

In rendering his decision, the ALJ reviewed records from Norton Community Hospital; Mountain View Regional Medical Center; Blue Ridge Medical Specialists; Dr. Shirish Shahane, M.D., a state agency physician; Southeastern Retina Associates; Kingsport Kidney Health, P.C.; Dr. Andrew J. Chapman, D.P.M., a podiatrist; Dr. Frank M. Johnson, M.D., a state agency physician; and Dr. Jody Bentley, D.O.

---

[4]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing often is necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2009).

On September 12, 2005, Dr. Donna Sanders, D.O., noted that Meade's systolic blood pressure readings ranged from the upper 160s to the lower 180s, with diastolic readings in the upper 90s to 120. (R. at 439.) His blood sugar levels ranged from the upper 280s and 290s, with a minimum of 265. (R. at 439.) Meade stated that he had been compliant with his medications, but was getting little effect from them. (R. at 439.) He complained of shortness of breath from walking up stairs for the previous two weeks. (R. at 439.) Meade denied any change in joint range of motion or muscle pain. (R. at 439.) Physical examination showed markedly decreased sensation of both lower extremities, as well as the distal portion of both upper extremities. (R. at 440.) Laboratory testing showed fasting glucose of 298 and elevated triglycerides. (R. at 440.) Microalbumin was markedly elevated at 11.7. (R. at 440.) All other laboratory studies were normal, including BUN and creatanine levels, which represented kidney function; liver enzymes and thyroid studies also were normal. (R. at 440.) Dr. Sanders diagnosed uncontrolled diabetes, for which insulin therapy was initiated, hypertension, for which Meade's dosage of Norvasc was increased, and Toprol and hydrochlorothiazide were initiated, and hyperlipidemia, controlled on Lopid. (R. at 440-41.) Dr. Sanders ordered an EKG and stress test to rule out the possibility of silent ischemia, and a chest x-ray due to Meade's history of working as a welder/steel worker. (R. at 441.) Meade was referred to nephrology to evaluate kidney problems leading to hypertension. (R. at 441.)

On September 19, 2005, Meade saw Dr. Sanders and Dr. Jody Bentley, D.O., for follow-up after presenting to the emergency room the previous night with weakness, chills and elevated blood pressure of 166/100. (R. at 436-38.) They noted a history of extremely poor medication compliance. (R. at 436.) Meade reported

feeling much better after getting his blood pressure under control the previous night. (R. at 436.) He admitted not taking his medications for at least one to two months and not checking his blood sugar levels or his blood pressure. (R. at 436.) Meade denied any changes in muscle strength. (R. at 436.) Physical examination showed full muscle strength in all extremities, reflexes were 2+ in all extremities, and no other somatic dysfunctions were detected. (R. at 438.) Meade was diagnosed with uncontrolled hypertension, uncontrolled hyperglycemia and hyperlipidemia. (R. at 438.) His medications were refilled, and he was advised to take his blood pressure every two to three days and keep a blood sugar diary. (R. at 438.) When Meade returned the following week, blood pressure and blood sugar logs showed poorly controlled conditions despite using "copious amounts of sliding scale regular insulin." (R. at 433.) Meade continued to complain of exertional dyspnea, but denied any joint pain or changes in muscle strength. (R. at 433.) His blood pressure was 130/90, and he continued to complain of moderate signs of peripheral neuropathy. (R. at 433-34.) No somatic dysfunctions were detected. (R. at 434.) Meade again was diagnosed with uncontrolled hypertension, and his dosage of Norvasc was increased, as was his Toprol and Lisinopril. (R. at 434.) Tapering off of Clonidine was begun, but his Lantus was increased, and his regular sliding scale of insulin was changed to a Humalog sliding scale. (R. at 434.) Meade also was prescribed Lipitor. (R. at 434.)

Meade underwent an exercise stress test on September 21, 2005, at Norton Community Hospital, the results of which were deemed normal. (R. at 468-70.) A myocardial perfusion scan showed no evidence of myocardial ischemia, and a chest x-ray showed no acute cardiopulmonary disease. (R. at 458-59.) On September 26, 2005, Meade again saw Dr. Sanders for follow up. (R. at 430-32.) Despite his

"excellent patient compliance," his blood pressure was not at goal level. (R. at 430.) Meade complained of a severe, pounding headache that began earlier that morning and was not relieved by aspirin. (R. at 430.) His blood pressure was 160/92. (R. at 430.) He had diminished sensation in the lower extremities, suggestive of diabetic neuropathy. (R. at 431.) Dr. Sanders increased Meade's Norvasc, Toprol, Lisinopril and Lantus, and she prescribed Lipitor. (R. at 431.)

On October 20, 2005, Meade saw Dr. Matthew D. Beasey, M.D., an endocrinologist, at the referral of Dr. Bentley. (R. at 326-27, 497-98.) Meade noted medication compliance, but stated that he was receiving help through local community assistance and his parents. (R. at 326.) Physical examination showed diminished vibratory and pinprick sensation bilaterally, as well as a markedly infected right great toenail with some erythema. (R. at 327, 498.) Dr. Beasey diagnosed diabetes mellitus type II, hypertension, an infected toenail, hypertriglyceridemia, retinopathy, proteinuria and neuropathy. (R. at 327, 498.) Meade's dosage of insulin was increased, he was prescribed Amoxil and was referred to a podiatrist. (R. at 327, 498.) Dr. Beasey questioned Meade's medication compliance given the number of medications prescribed and his financial situation. (R. at 327, 498.)

On October 24, 2005, Meade saw Dr. Abrar Ahmad, M.D., a nephrologist with Kingsport Kidney Health, P.C., upon referral by Dr. Bentley for an evaluation of diabetic neuropathy, hypertension and microalbuminuria.[5] (R. at 397-99.) Meade voiced no complaints at this visit, and his blood pressure was 124/76. (R. at 397-98.)

---

[5]Albuminuria is another term for proteinuria, and means protein in the urine. Microalbuminuria, therefore, refers to a small amount of protein in the urine. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 43, 1031, 1371 (27th ed. 1988).

He had no protein or blood in the urine at that time, and Dr. Ahmad opined that Meade's microalbuminuria was secondary to his long-standing diabetes and hypertension. (R. at 398.) Meade did, however, have glucose of 511 in the urine. (R. at 395.) Dr. Ahmad diagnosed hypertension, well-controlled with medications, and diabetes, which needed more aggressive control, as evidenced by glucose in the urine and blood sugars of more than 180. (R. at 399.) He increased Meade's dosage of Benicar and instructed him to follow up in four months to monitor his renal function and proteinuria. (R. at 398-99.)

The following day, Dr. Andrew J. Chapman, D.P.M., a podiatrist, removed an ingrown toenail on Meade's right great toe. (R. at 411.) Meade tolerated the procedure well and experienced no complications. (R. at 407, 411.) Meade was admitted to Norton Community Hospital on October 31, 2005, with possible right orbital cellulitis and hyperglycemia, with a blood glucose level of 400. (R. at 296-311.) A physical examination revealed normal muscle strength in all extremities and 2+ neurologic reflexes in all extremities. (R. at 300.) Cerebellar reflexes, including heel-toe and finger-nose coordination, were grossly intact. (R. at 300.) Meade received intravenous hydration and antibiotic therapy. (R. at 296.) Right orbital pain and swelling resolved, and glucose levels returned to baseline. (R. at 296.) Meade was discharged on November 2, 2005, in stable condition. (R. at 296.)

A renal ultrasound administered on November 8, 2005, showed no hydronephrosis.[6] (R. at 312.) On November 21, 2005, Meade presented to Mountain

_____

[6]Hydronephrosis is the accumulation of urine and pus in the pelvis of the kidney. *See* Dorland's at 786.

View Regional Medical Center with complaints of flu-like symptoms. (R. at 314-24.) A chest x-ray showed no active cardiopulmonary disease. (R. at 315.) Meade was admitted to the hospital with a diagnosis of viral syndrome. (R. at 316-17.) On November 28, 2005, Meade informed Dr. Sanders and Dr. Bentley that his blood pressure had remained 150 to 170 systolic and 90 to 110 diastolic. (R. at 426.) They questioned Meade's medication compliance given his inability to remain normotensive as an outpatient. (R. at 426.) At that time, Meade's blood pressure was 170/110, but decreased after being given Clonidine. (R. at 426.) Physical examination showed diminished sensation in the lower extremities. (R. at 427.) Meade had normal strength in all extremities, patellar reflexes were mildly diminished, and he had 1+ bilateral lower extremity reflexes. (R. at 427.) Bilateral upper extremities were within normal limits at 2+, but Achilles reflex was diminished bilaterally. (R. at 427.) Meade was prescribed Clonidine. (R. at 427.)

On December 5, 2005, Meade informed Dr. Sanders and Dr. Bentley that he was taking over-the-counter decongestants, which he felt increased his blood pressure. (R. at 423-25.) Dr. Sanders and Dr. Bentley noted that Meade's blood pressure remained uncontrolled despite maximum therapy. (R. at 423.) Meade had markedly diminished sensation in both lower extremities and was unable to detect most sensations. (R. at 424.) He was given a trial of Cardura. (R. at 424.) Again, the possibility of noncompliance was noted. (R. at 425.) Dr. Sanders and Dr. Bentley stated that Meade's diabetes mellitus was much improved. (R. at 425.) Diet and exercise were encouraged. (R. at 425.)

On December 1, 2005, Dr. Chapman prescribed custom diabetic insoles. (R.

at 406.)  On December 15, 2005, Meade informed Judy Walton, a family nurse practitioner for Dr. Beasey, that his blood sugar levels were between 105 and 135.  (R. at 325, 496.)  He reported exercising by walking a lot at work and following a diabetic diet.  (R. at 325, 496.)  Meade reported neuropathy in both feet without pain, and he informed Walton that at his most recent eye examination, two months previously, he had some fluid behind his eyes.  (R. at 325, 496.)  Meade's blood pressure was 156/80, and his weight was up 20 pounds to 268.  (R. at 325, 496.)  Meade's diagnoses remained unchanged.  (R. at 325, 496.)  When Meade returned to Dr. Chapman on December 19, 2005, he reported that he had a blood blister that had burst on his right great toe.  (R. at 405.)  Dr. Chapman applied softener to the site.  (R. at 405.)

On December 27, 2005, Meade presented to the emergency department at Norton Community Hospital with complaints of cough, congestion, runny nose, difficulty breathing, fever, chills, vomiting and high blood pressure.  (R. at 339-48.) A chest x-ray was normal, and Meade was diagnosed with acute bronchitis and prescribed antibiotics.  (R. at 340-41.)  He was discharged in stable condition.  (R. at 342.)  Meade returned two days later with essentially the same complaints, noting that he was feeling no better.  (R. at 330.)  His blood pressure was 150/92.  (R. at 332.) He was diagnosed with acute bronchitis and acute sinusitis and was advised to continue his medications.  (R. at 330, 338.)  On January 2, 2006, when Meade saw Dr. Bentley, he reported feeling better, but not much.  (R. at 420-22.)  He noted that he was out of his blood pressure medication. (R. at 421.) Physical examination showed no focal motor or sensory deficit, as well as a normal gait. (R. at 421.) Dr. Bentley diagnosed acute rhinosinusitis with a possible component of bronchitis. (R. at 421.)

He prescribed Levaquin and recommended Robitussin for cough. (R. at 421-22.) Meade's diabetes mellitus was deemed poorly controlled, and Dr. Bentley noted the need for increased compliance. (R. at 422.) Dr. Bentley stated that Meade's hypertension was somewhat better controlled. (R. at 422.) Meade again returned to the emergency department at Norton Community Hospital on January 5, 2006, with complaints that his condition was not getting better. (R. at 353.) His blood pressure was 102/77. (R. at 352.) Meade was diagnosed with acute bronchitis and acute sinusitis and was again advised to take Robitussin in addition to his antibiotics. (R. at 350, 355.) On January 9, 2006, Meade returned to the emergency department at Norton Community Hospital complaining that he was not improving with antibiotics, and he complained of right orbital pain and swelling. (R. at 359-77.) He rated his sinus pain as an eight on a 10-point scale. (R. at 359.) Meade's blood pressure was 160/90. (R. at 360.) Physical examination revealed normal muscle strength in all extremities, and 2+ neurologic reflexes in all extremities. (R. at 361.) No somatic dysfunction was noted. (R. at 361.) The right plantar area over the first metatarsophalangeal joint showed a stage 2 diabetic ulcer with skin loss. (R. at 361.) A CT scan of Meade's head was normal, as was a CT scan of the orbits, showing no orbital cellulitis. (R. at 375-76.) Meade was diagnosed with acute sinusitis and failed outpatient antibiotics, probable right orbital cellulitis, uncontrolled hypertension, uncontrolled diabetes mellitus, right great toe skin loss, neuropathy and retinopathy. (R. at 361.) Meade was admitted to the hospital for intravenous antibiotic therapy. (R. at 361.)

Dr. Sanders noted that Meade's diabetes and hypertension would be monitored to assure medication compliance. (R. at 362.) She further noted that a lesion on Meade's great toe would be monitored, and he would be referred to Dr. Chapman

following discharge. (R. at 362.) Meade was discharged the following day with diagnoses of sinusitis, resistant to outpatient treatment, with eye pain and acute bronchitis, resistant to outpatient therapy. (R. at 357-58.) He also was diagnosed, secondarily, with noninsulin dependent diabetes mellitus, diabetic nephropathy and uncontrolled hypertension, noncompliant. (R. at 357.) On discharge, Meade was "much improved," and was placed on a diabetic diet and a low-salt, low-fat cardiac diet. (R. at 357.) He was advised to perform activity as tolerated, and he was advised to return to work on January 11, 2006. (R. at 357.)

When Meade saw Dr. Chapman on January 11, 2006, he complained of a medial ulceration on the right great toe. (R. at 403.) Dr. Chapman diagnosed diabetes mellitus neurotrophic ulcer and evidence of chronic tinea plantar aspect to both feet. (R. at 403.) The ulcer site was debrided and medicated, and Dr. Chapman encouraged compliance with diabetic insoles. (R. at 403.)

Dr. Shirish Shahane, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment on January 18, 2006, finding that Meade could perform light work with an occasional ability to climb, to balance, to stoop, to keel, to crouch and to crawl. (R. at 379-86.) He indicated that Meade should avoid concentrated exposure to extreme cold, vibration and hazards. (R. at 382.)

On February 6, 2006, Meade again saw Dr. Sanders and Dr. Bentley. (R. at 416-19.) He informed them that he had lost his job due to his numerous health problems. (R. at 416.) Meade reported walking two and one-half to three miles daily, having lost four pounds since his previous visit. (R. at 417.) His blood pressure

was170/110. (R. at 417.)  Dr. Sanders and Dr. Bentley stated that because Meade was "maxed out" on the traditional medication regimen, he needed to be evaluated by a nephrologist regarding his uncontrolled hypertension and proteinuria. (R. at 418.) They noted that Meade's diabetes mellitus remained uncontrolled, but they opined that they might be better able to control it since Meade had lost his job, in that they would better be able to titrate his medications. (R. at 418.) When Meade was employed, it was feared that titration would result in a hypoglycemic accident. (R. at 418.) He was encouraged to continue seeing Dr. Beasey and Dr. Chapman, and he was advised to obtain an appointment with his retinal specialist. (R. at 418.)  A prescription pad notation by Dr. Bentley read as follows: "Unable to work due to disease state & meds needed to treat these disease states."  (R. at 486.)

On February 9, 2006, Meade saw Dr. Howard L. Cummings, M.D., an opthalmologist, at Southeastern Retina Associates, for a retinal examination. (R. at 388.)  Meade reported that he had seen another opthalmologist the previous October, at which time he had fluid behind his right eye. (R. at 388.) Meade's visual acuity was 20/30 in both eyes with correction. (R. at 387.) Fundus photography showed normal optic nerves in both eyes. (R. at 387.) Clinically, there was no retinal thickening.  (R. at 387.) Dr. Cummings diagnosed diabetic macular edema of the right eye, not clinically significant, and nonproliferative diabetic retinopathy of both eyes.  (R. at 387.)  He recommended observation and a follow-up in six months.  (R. at 387.)

Meade returned to Kingsport Kidney Health, P.C., on February 16, 2006, for follow- up.  (R. at 395-96.)  His blood pressure was 120/80, and his glucose level was 333.  (R. at 395.)  Dr. Steven C. Butler, M.D., diagnosed diabetic nephropathy, noting

continued microalbuminuria. (R. at 395.) Dr. Butler further noted that Meade's blood pressure was under acceptable control with medications, but he needed to "tighten" his diabetic control. (R. at 395.) Meade was instructed to follow up in six months. (R. at 395.)

When Meade saw Dr. Sanders and Dr. Bentley on March 6, 2006, he reported doing well with medications, with which he had been compliant. (R. at 413-15.) His blood pressure was 160/90. (R. at 413.) Dr. Sanders and Dr. Bentley questioned Meade's medication compliance, noting that Lopressor typically markedly decreased pulse rate, but Meade's was 102. (R. at 414.) Nonetheless, they noted better control of Meade's diabetes mellitus. (R. at 414-15.) Dr. Sanders and Dr. Bentley also noted that Meade's cholesterol was at goal level. (R. at 415.)

On March 27, 2006, Meade saw Walton, Dr. Beasey's nurse practitioner, for follow- up. (R. at 495.) He reported blood sugar levels between 77 and less than 150 and no hypoglycemic episodes. (R. at 495.) Meade noted decreasing his carbohydrate intake, as well as exercising. (R. at 495.) He reported neuropathy with pain. (R. at 495.) Meade's blood pressure was 140/100, and his weight was down 10 pounds to 258. (R. at 495.) Physical examination revealed decreased sensation to the mid-dorsal surface of the foot to pinprick, and he had no sensation of the plantar surface of the foot. (R. at 495.) Meade's dosage or Cardura was increased. (R. at 495.)

Dr. Frank M. Johnson, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Meade on May 10, 2006, finding that Meade could perform light work with an occasional ability to climb, to balance, to

stoop, to kneel, to crouch and to crawl.  (R. at 471-77.)  He opined that Meade should avoid concentrated exposure to extreme cold, vibration and hazards, such as machinery and heights.  (R. at 474.)

On July 3, 2006, Meade was admitted to Norton Community Hospital with complaints of nausea, vomiting, abdominal pain and diarrhea for the previous three days.  (R. at 480-83.)  Meade had elevated creatinine levels and he was acidotic.[7] (R. at 480.)  He was administered intravenous fluids and antinausea medications.  (R. at 480.)  Meade's blood pressure was 160/100, his oropharyngeal mucous membranes were very dry, and his tongue was "very tacky."  (R. at 481.)  No somatic dysfunction was detected. (R. at 482.)  Abdominal x-rays and chest x-rays were normal.  (R. at 484.)  Meade was diagnosed with dehydration, acute or chronic renal failure, gastroenteritis and urinary tract infection.  (R. at 482.)  He was rapidly hydrated and stabilized and discharged home the same day.  (R. at 482.)

On August 21, 2006, Elaine White, a family nurse practitioner for Dr. Beasey, saw Meade for follow-up.  (R. at 492.)  Meade reported blood sugar readings between 150 and 200, and he denied any hypoglycemic episodes.  (R. at 492.)  Meade reported following his diet, but not exercising much.  (R. at 492.)  Meade's triglycerides were markedly elevated, and his hypertension remained above goal level, but was improved with additional antihypertensive therapy initiated by the nephrologist.  (R. at 492.) His neuropathy was deemed stable.  (R. at 492.)

---

[7]Acidosis refers to a pathologic condition resulting from accumulation of acid or depletion of the alkaline reserve in the blood and body tissues, and characterized by an increase in hydrogen ion concentration.  This condition can result from uncontrolled diabetes mellitus. *See* Dorland's at 17.

On September 11, 2006, Junction Center for Independent Living, Inc., sent a letter to Meade's attorney stating that Meade had received some medications through its Pharmacy Connect program since August 2005, including Glucophage, Toprol XL, Lipitor, Norvasc, Tricor, Benicar and Lantus. (R. at 491.)

Meade underwent another exercise stress test on September 27, 2006, the results of which were normal. (R. at 487.) Myocardial perfusion showed no definite evidence of myocardial ischemia. (R. at 488.) The following day, an echocardiogram showed mild to moderate ventricular hypertrophy, but could not rule out pseudonormalization pattern of diastolic dysfunction, trace tricuspid regurgitation and mild pulmonary hypertension. (R. at 489-90.)

## III. Analysis

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2009).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2009); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the

wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.  Meade argues that the ALJ erred by failing to adhere to the treating physician rule and give controlling weight to the opinions of Dr. Bentley. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-8.)  Meade also argues that the ALJ erred by failing to find that his impairments met or equaled the medical listing for diabetes mellitus, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 9.08(A).  (Plaintiff's Brief at 8-10.)

Under 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), the ALJ must give controlling weight to a treating source's opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence of record. The ALJ must consider objective medical facts and opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869.  The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2009).  However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)).  In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less

weight." *Craig*, 76 F.3d at 590.

To the extent that Meade is arguing that the ALJ erred by failing to grant controlling weight to Dr. Bentley's opinion that Meade was unable to work due to his impairments and medications used to treat those impairments, the court finds this argument unpersuasive. Pursuant to 20 C.F.R. §§ 404.1527(e), 416.927(e), opinions regarding disability are not medical opinions, but administrative findings dispositive of a claimant's case, and, thus, are reserved to the Commissioner. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled[,]" nor is it entitled to any special significance. 20 C.F.R. §§ 404.1527(e)(1), (3), 416.927(e)(1), (3) (2009). That being the case, substantial evidence supports the ALJ's decision not to grant controlling weight to Dr. Bentley's opinion that Meade was unable to work. I also note that Dr. Bentley had released Meade to work on January 11, 2006, and only after Meade informed him that his former employer did not want him to do so due to medication side effects and the need to frequently check his blood sugar levels, did Dr. Bentley opine that Meade could not work.

Next, to the extent that Meade is arguing that the ALJ erred by failing to grant Dr. Bentley's opinions controlling weight, in that Dr. Bentley's diagnoses support a finding of disability, I also find such argument unpersuasive. Dr. Bentley treated Meade from September 2005 to March 2006, over which time he diagnosed Meade with uncontrolled hypertension, uncontrolled hyperglycemia, hyperlipidemia and proteinuria. Dr. Bentley referred Meade to several specialists, including a nephrologist, an endocrinologist, an opthalmologist and a podiatrist. Despite Dr.

Bentley's diagnoses and referrals, however, no restrictions were imposed on Meade, with the exception of Dr. Bentley's statement on February 6, 2006, that Meade was unable to work. As stated above, however, such statement was made only after Meade informed Dr. Bentley that his employer had essentially let him go due to fear of medication side effects and the need to frequently check blood sugar levels. Before this time, Dr. Bentley placed no restrictions on Meade's ability to work, and he even released him to return to work on January 11, 2006. As the Commissioner argues in his brief, diagnoses, in and of themselves, do not equate to a finding of disability. Instead, such diagnoses must be accompanied by some showing of related functional loss. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (in the context of psychological disorders).

With regard to Meade's argument that Dr. Bentley's opinion that he was unable to work is supported by the opinions of Dr. Beasey, Dr. Ahmad and nurse practitioner Walton, I find these arguments equally unpersuasive. First, Dr. Beasey, an endocrinologist who treated Meade for his diabetes mellitus, never placed any work-related limitations on Meade. Although the Commissioner questions Meade's medication compliance based largely on a conversation between Meade and Dr. Beasey's nurse practitioner in August 2006, I am compelled to state that Meade's counsel has submitted a letter from Junction Center for Independent Living, Inc., stating that Meade began receiving some medications through its Pharmacy Connect Program in August 2005. (R. at 491.) The court reserves any finding as to Meade's medication compliance. In any event, it is clear is that Dr. Beasey did not place any functional restrictions on Meade due his impairments in spite of his questionable compliance.

Likewise, Meade saw Dr. Ahmad, a nephrologist, in October 2005. Dr. Ahmad diagnosed microalbuminuria, secondary to Meade's long-standing diabetes and hypertension. (R. at 398.) He noted that Meade's hypertension was well-controlled with medications, but that his diabetes needed "more aggressive control." (R. at 399.) Dr. Ahmad placed no restrictions on Meade's work-related functions. Meade saw Dr. Butler, also a nephrologist, in February 2006, for a follow-up. (R. at 395-96.) Dr. Butler diagnosed diabetic nephropathy and continued microalbuminuria. (R. at 395.) He noted that Meade needed to "tighten" his diabetic control, but he placed no restrictions on Meade's work-related functions. (R. at 395.)

Finally, Walton, Dr. Beasey's nurse practitioner, saw Meade on December 15, 2005, and again on March 27, 2006. (R. at 325, 495.) In December 2005, Walton diagnosed diabetes mellitus type II, right infected great toe, hypertension, hypertriglyceridemia, retinopathy, proteinuria and neuropathy, stable. (R. at 325.) Walton placed no restrictions on Meade's work-related functions, and Meade even reported that he was following a diabetic diet and walking a lot at work for exercise. (R. at 325.) In March 2006, Meade again reported dieting and exercising, and Walton noted that he had lost 10 pounds. (R. at 495.) His diagnoses remained unchanged, and Walton increased his dosage of Cardura, but she imposed no restrictions on his work-related functioning. (R. at 495.)

For all of these reasons, I find that substantial evidence supports the ALJ's failure to grant controlling weight to the opinion of Dr. Bentley, Meade's treating physician, that Meade was unable to work. I also find, for the above-stated reasons, that substantial evidence supports the ALJ's conclusion that a finding of disability is

not supported by Dr. Bentley's treatment notes or the other medical evidence of record.

Next, Meade argues that the ALJ erred by failing to find that his impairments met or equaled the medical listing for diabetes mellitus, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 9.08(A). For the following reasons, I disagree. In order to meet § 9.08(A), a claimant must show that he suffers from diabetes mellitus with neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dextrous movements, or gait and station. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 9.08(A) (2009). "Persistent disorganization of motor function" is defined by the regulations as "paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations. . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00(C) (2009). The regulations go on to state that "[t]he assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00(C). Meade has the burden of proving that his impairments, alone or in combination, meet or equal a listed impairment. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the claimant has the burden of showing that he has a medically severe impairment or combination of impairments and that the Act requires him to furnish medical evidence regarding his condition); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (stating that the burden of production and proof is on the claimant to establish that he has an impairment that meets or equals a listing).

The ALJ did not specifically address § 9.08(A). However, for the following reasons, I find that substantial evidence supports the ALJ's failure to find that Meade's impairments met or equaled this listing. The record does not establish the existence of ineffective ambulation or an inability to perform fine and gross movements effectively. Although Meade has not been evaluated by a neurologist, there are several physical examinations contained in the record during which neurological function was tested. Although these examinations consistently showed decreased sensation in the lower extremities, they, otherwise, were unremarkable. For instance, in September 2005, Meade had markedly decreased sensation of both lower extremities and of the distal portion of both upper extremities. (R. at 440.) Later that month, he had full muscle strength in all extremities, reflexes were 2+ throughout, and no other somatic dysfunctions were detected. (R. at 434, 438.) On September 26, 2005, Meade exhibited diminished sensation in the lower extremities. (R. at 431.) On October 20, 2005, Meade again exhibited diminished vibratory and pinprick sensation bilaterally. (R. at 327, 498.) On October 31, 2005, he had normal muscle strength and 2+ neurologic reflexes throughout. (R. at 300.) Cerebellar reflexes were grossly intact. (R. at 300.) On November 28, 2005, Meade again showed diminished sensation in the lower extremities, but he had normal strength throughout and normal upper extremity reflexes, with mildly diminished patellar reflexes, lower extremity reflexes and Achilles reflexes. (R. at 427.) On December 5, 2005, Meade had markedly diminished sensation in both lower extremities. (R. at 424.) On January 2, 2006, he had no focal motor or sensory deficit and a normal gait. (R. at 421.) On January 9, 2006, he had normal muscle strength and 2+ neurologic reflexes. (R. at 361.) On March 27, 2006, Meade had decreased sensation to the mid-dorsal surface of the foot to pinprick, and he had no sensation of the plantar surface of the foot. (R. at 495.)

Moreover, Meade testified that he had not been prescribed any assistive devices, (R. at 65), and his activities of daily living include preparing light meals daily, cleaning and doing laundry and shopping on a weekly basis. (R. at 207-08.) He stated that he could drive a car. (R. at 208.) Meade confirmed at his hearing that he walked up three flights of stairs to the hearing room, but had to stop three times. (R. at 65.) He further testified that he tried to exercise as much as he could, including walking around his "dad's place" and walking around a track. (R. at 66.) He stated that he walked a mile three to four times a week, but not all at one time. (R. at 66-67.) In December 2005, Meade informed Walton that he exercised by walking a lot at work. (R. at 325, 496.) In February 2006, he informed Dr. Sanders and Dr. Bentley that he walked two and one-half to three miles daily. (R. at 417.) Meade also was able to perform two exercise stress tests to completion, one in September 2005 and another in September 2006. (R. at 468, 487.) Finally, state agency physicians Drs. Shahane and Johnson both opined that Meade could perform light work with an occasional ability to perform postural activities. (R. at 380-81, 472-73.) Neither Dr. Shahane nor Dr. Johnson imposed any limitations on Meade's ability to push and/or pull with the upper or lower extremities, and neither imposed any limitations on his ability to handle objects (gross manipulation), to finger objects (fine manipulation), or to feel objects. (R. at 381, 473.)

For all of the above-stated reasons, I find that substantial evidence supports the ALJ's failure to find that Meade's impairments met or equaled the criteria for diabetes mellitus, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 9.08(A).

# PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists to support the Commissioner's weighing of the medical evidence;

2.  Substantial evidence exists to support the Commissioner's failure to find that Meade's diabetes mellitus met or equaled the requirements of the listed impairment therefor, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 9.08(A); and

3.  Substantial evidence exists to support the Commissioner's finding that Meade was not disabled under the Act and was not entitled to DIB or SSI benefits.

# RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Meade's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

# <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2009):

Within fourteen days after being served with a copy [of this Report and

Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     May 25, 2010.

/s/   *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE